Theon MERRILL, Plaintiff, Appellant,
and Cross–Respondent,

v.

CACHE VALLEY DAIRY ASSOCIA-
TION, a Utah Cooperative, Defendant,
Respondent, and Cross–Appellant.

No. 19204.

Supreme Court of Utah.

Dec. 1, 1987.

As Amended on Denial of Rehearing
March 4, 1988.

William L. Schultz, Salt Lake City, for
plaintiff, appellant and cross-respondent.

B.H. Harris, Joseph M. Chambers, Lo-
gan, for defendant, respondent and cross-
appellant.

HALL, Chief Justice:

Cache Valley Dairy Association (defend-
ant) terminated Theon Merrill's member-
ship in that organization in 1982. There-
after, Merrill sued defendant for injunctive
relief, for attorney fees, and for a declara-
tory judgment determining his contractual
membership rights in defendant. The trial
court granted defendant's motion for sum-
mary judgment in part and dismissed Mer-
rill's action. Merrill seeks reversal of the
trial court order and entry of judgment in
his favor or, alternatively, that the case be
remanded with "instructions." Defendant
seeks both reversal of that portion of the
order denying its request for attorney fees
and review of the trial court's granting of a
preliminary injunction.

## I

When ruling on an appeal from an adverse decision on a motion for summary judgment, our inquiry extends to the determination of whether there is any genuine issue as to any material fact and, if there is not, whether the moving party is entitled to judgment as a matter of law.[1] In *Blodgett v. Martsch*,[2] we stated:

> In reviewing the record on any appeal from summary judgment, we treat the statements and evidentiary materials of the appellant as if a jury would receive them as the only credible evidence, and we sustain the judgment only if no issues of fact which could affect the outcome can be discerned.[3]

With these principles in mind, the record supports the following statement of facts. Defendant is an agriculture cooperative located in Cache County, Utah, and is incorporated and operating under the Utah Agriculture Cooperative Act (title 3 of the Utah Code). This status allows defendant to receive favorable tax treatment as a cooperative under subchapter "T" of the Internal Revenue Code. Defendant had approximately 515 members who resided in Utah, Idaho, and Wyoming when this action was filed.

In September 1979, Merrill, a Cache Valley dairy farmer, became a Utah member of and producer for defendant after signing an application for membership. The application provides that "membership and all rights as a member are subject to and in accordance with the Articles of Incorporation of the association, the By laws, other Rules and Regulations, and the standard Producers Agreement...."

Pursuant to Idaho Code § 25–3117(1)–(2) (Supp.1987), defendant withholds one percent of the gross dollar daily or monthly settlements of all milk and cream it receives from its Idaho producers/members. The assessment is then paid to the Idaho Dairy Products Commission for marketing purposes. Pursuant to Utah Code Ann. § 4–22–7 (1982) (amended 1986), defendant also withholds one percent of the gross dollar amount of all sales of milk and cream produced by its Utah members/producers. These funds in turn are remitted to the Utah Dairy Commission (the "UDC") for marketing purposes.[4]

At least twenty-one of defendant's Utah members/producers requested an assessment refund from the UDC pursuant to Utah Code Ann. § 4–22–7(4) (1982) (amended 1986) for the year ending December 31, 1981. Merrill was one of these members/producers. The record indicates that at a special March 1982 meeting, at which Merrill was present, several of the members requesting a refund were asked to sign a withdrawal of their application for a refund. In an affidavit, Merrill claims he was informed that failure to sign would result in the termination of his membership. Merrill did not withdraw his request for a refund.

The board of directors of defendant determined by a resolution unanimously adopted on May 26, 1982, that it would assess all association members a uniform fee consisting of one percent of the gross dollar amount of milk sold to the association. The funds were to be used in advertising and promoting dairy products. Satisfaction of the assessment could be made by either of the following methods:

(1) Paying the assessment imposed on the sale of milk as provided by Section 4–22–7 U.C.A.1953 as amended, wherein such funds are used by the Utah Dairy Commission to promote the sale and advertising of dairy products; or

(2) Any members who elect to have the 1% refunded to them pursuant to the foregoing statute as authorized by state law, then such member shall be required to deposit said refund or the equivalent thereof and pay the same to the Cache

---

1. *See, e.g., Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987); *Thornock v. Cook,* 604 P.2d 934, 936 (Utah 1979); *see also* Utah R.Civ.P. 56(c).

2. 590 P.2d 298 (Utah 1978).

3. *Id.* at 300.

4. For purposes of this opinion, we assume the state of Wyoming does not assess a marketing fee. *But see* Wyo.Stat. § 11–36–106 (1978).

Valley Dairy Association for the Association to use in its sales promotions and advertising of its dairy products which are marketed by the Association.

Any member of this Association who refuses to pay the assessment for advertising and sales promotion as set forth above, shall be deemed to be a non-cooperator and their membership may be terminated at the election of the Board of Directors.

On or about the first day of June 1982, Merrill received by registered mail a copy of the resolution. A few days thereafter, he also received by registered mail a notice signed by the president and the secretary of defendant terminating his membership as of June 30, 1982. Defendant subsequently extended the termination date to July 31, 1982.

The producers agreement, which is incorporated into the membership application, provides:

### XIII.

This contract shall remain in force for a period of ten (10) years from date, unless cancelled in writing by either party between the first and tenth day, inclusive, of the month of June of any year, written notice of such cancellation to be served upon the opposite party, provided that member may not cancel this contract and withdraw from the Association while indebted thereto. This contract shall be automatically renewed for an additional period of 10 years unless sooner cancelled in the manner set forth in this paragraph.

Merrill initiated this action in July 1982. The trial court subsequently issued a temporary restraining order requiring defendant to pick up Merrill's milk. After a hearing, the order was modified into a preliminary injunction. In November 1982, Merrill filed an amended complaint, and subsequently, defendant answered and counterclaimed for declaratory judgment, an order of dismissal, and attorney fees. In a memorandum decision, the trial court ruled on defendant's and Merrill's cross-motions for summary judgment. The trial court ruled in defendant's favor except as to its request for attorney fees. The trial court held that paragraph XIII of the producer's agreement (quoted above) allowed cancellation by either party without cause and that the board of directors properly terminated Merrill in accordance with the provision. The court further held that the May 26, 1982 resolution was within the authority of the Board and not discriminatory as against Merrill. Later, the defendant caused a second notice of termination to be served on Merrill for failing to comply with the May 26th resolution for the period May 26, 1982, to May 31, 1983. On June 13, 1983, the injunction was finally dissolved.

### II

■ Merrill contends that the May 26th resolution was the product of invalid board action and is therefore void. Thus, Merrill claims his termination for refusing to comply with the resolution was invalid.

In accordance with Utah law, defendant's members have adopted by-laws to govern the cooperative's operation.[5] Defendant's by-law No. 14, section 2 provides in part:

The Board of Directors is the governing body of the Association and it shall have and may exercise all the powers, consistent with law, necessary for carrying on the business of the Association, and it shall be the duty of the Board to exercise care and diligence in conducting the affairs of the Association.

Defendant's by-law No. 9 provides in part:

The amount and manner of payment of fees, dues, assessments and other charges for service to members and other producers shall be fixed from time to time by resolution of the Board of Directors. The fees and dues for such services to members shall be in the form of scale-offs or retains, and shall be upon a uniform basis after received at the plant, subject to quality and quantity.

The above-quoted provisions give defendant's board of directors the power to adopt

---

**5.** Utah Code Ann. § 3–1–8 (1982)

resolutions, consistent with the limits in by-law No. 9, requiring payment of fees for the benefit of defendant's marketing program. In its brief, defendant states:

> By-law 9 gives the Board the right to levy a uniform assessment with the *only restrictions* being the amount and manner in that any assessment made must be made on a uniform basis in the form of a retains or scale off, taking into consideration the quality and quantity of a producer's milk.

(Emphasis in original.) Merrill claims the assessment is not uniform. We agree.

The effect of the May 26th resolution is to assess members on a nonuniform basis, a conclusion necessitated because the resolution is nonuniform on its face. The one percent assessment, as stated in the resolution and in defendant's brief, is applicable to all of defendant's members, which include members/producers in Utah, Idaho, and Wyoming. The resolution allows members covered by Utah Code Ann. § 4–22–7 (1982) (amended 1986) to satisfy defendant's assessment by paying the assessment imposed by the statute and not requesting a refund thereof. Conversely, members covered by Idaho statute § 25–3117 cannot, by the terms of the resolution, satisfy defendant's assessment by paying the assessment imposed by Idaho's statute. Thus, Utah members receive credit for payment of state-imposed assessments while Idaho members do not; the resolution effectively levies a two percent assessment on Idaho members and a one percent assessment on Utah members. Furthermore, the resolution violates by-law No. 9 because it imposes an assessment which is not in the form of a scale-off or retains as required by that by-law; the alternative method of satisfying defendant's one percent assessment is in the form of a remittal. Accordingly, the resolution is in violation of by-law No. 9 and is therefore void and of no effect.[6]

Therefore, the board could not terminate Merrill's membership for violating the resolution in the years ended in June 1982 or May 1983.

## III

■ Defendant contends that it had a contractual right to terminate Merrill's contract without cause. A voluntary member of an association agrees to be bound by its valid rules and subjects itself to its discipline.[7] Indeed, it has been written:

> Rights of a member on withdrawal or expulsion from a cooperative association may be regulated in the bylaws of the association, and where this is the case, their provisions control. It has been held that the power of expulsion of members, granted by statute to cooperative associations, resides in the entire membership of all the stockholders where it has not been delegated to the board of directors; the directors of a cooperative association possess no inherent power to expel members.[8]

By-law No. 7 provides:

> The Association shall have the right to terminate and cancel memberships whenever it appears to the Board that the holder thereof is ineligible to hold the same, or that he has violated the Articles of Incorporation, the By–Laws, the Marketing Contract, or other regulations of the Association.

This provision, which has the same force and effect on defendant as a provision in its articles of incorporation,[9] clearly requires cause for termination of a member's rights.

Defendant contends that its by-law No. 8 does not limit it from withdrawing from the producer's agreement. That by-law provides: "There shall be designated in the Marketing Contract [producer's agreement] a period of ten days in each year during

---

6. *See* 8 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 4197 (rev. perm. ed. 1982).

7. 18 Am.Jur.2d, *Cooperative Associations* § 21 at 289 (1985); 6 Am.Jur.2d, *Associations & Clubs* § 32 (1963).

8. 18 Am.Jur.2d, *Cooperative Association* § 26 (1985).

9. *See* 8 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 4197 (rev. perm. ed. 1982).

which the member may withdraw, by serving upon the Association written notice of intention to withdraw." Defendant contends that the provision was included only to comply with Utah Code Ann. § 3–1–17 (1982) (providing in part for withdrawal from associations), and therefore, that the negative inference that defendant cannot withdraw from the membership agreement should not follow. We disagree. It is inescapable that nothing in that statutory section facially precluded defendant from including itself in the terms of by-law No. 8 so it could withdraw from the membership agreement. Thus, the by-laws provide that memberships may be terminated and cancelled for *cause* by defendant or that a member/producer may withdraw and cancel his or her membership agreement during the period specified in the contract (producers agreement).

■ Defendant relies on paragraph XIII of the producers agreement to support its termination of Merrill's contract. However, it is necessary to glean the meaning of paragraph XIII from the membership agreement as a whole.[10] When read together with the reference in by-law No. 8 referring to the "Marketing Contract" for definition of the termination period, it is clear that paragraph XIII of the producers agreement only provides a temporal window during which the contract may be cancelled by the parties pursuant to by-law Nos. 7 and 8. Paragraph XIII allows either party to "cancel" the contract. The by-laws state the conditions for cancellation in by-law Nos. 7 and 8. Therefore, paragraph XIII does not give defendant a license to terminate its members' contracts without cause.

Defendant further relies on the membership application to sustain its actions. That document provides in part:

It is also understood and agreed this agreement shall remain in force and effect for one year from date and shall be terminated then only by either party giving the other party notice in writing that it intends to abandon this contract between the first and tenth day, inclusive, of the month of June.

We interpret this paragraph of defendant's membership application in the same fashion as paragraph XIII of the producers agreement. When standing alone, the paragraph appears to give either party discretion to terminate the contract. When read in light of the entire agreement, the paragraph merely provides the period in which the membership agreement can be terminated pursuant to by-law Nos. 7 and 8.

The determination of the issues above make it unnecessary for us to address the other issues submitted by the parties. Therefore, the lower court order is reversed, and the case is remanded for proceedings consistent with this opinion. Costs to Merrill.

STEWART, Associate C.J., and ZIMMERMAN, J., concur.

HOWE, Justice: (dissenting)

I dissent. The majority opinion misinterprets the rights of the Dairy Association and seriously confuses its annual right not to renew the producer's agreement with its right to expel a member at any time for cause. The net effect of the majority opinion is that the Dairy Association is locked into a producer's agreement to purchase milk from the producer for twenty years unless the Association can find good cause to expel him. On the other hand, the member/producer has the unconditional right each year to opt out of the agreement.

The Association was organized under Utah Code Ann. § 3–1–17 (1982). That section deals with contracts between the Association and its members and provides in part:

(I) The bylaws may require members to execute contracts with the association

---

**10.** *See* Annotation, *Construction and Effect of Co-operative Farm or Dairy Products Agreement with Respect to Association's Charges and Deductions for Gathering, Grading, Processing, Shipping, and Marketing the Products,* 90 A.L. R.2d 1142, 1146 (1963). As noted above, the membership application expressly integrates defendant's articles of incorporation, by-laws, rules and regulations, producers agreement and membership application as part of the membership agreement.

in which the members agree to patronize the facilities created by the association, and to sell all or a specified part of their products to or through it.... If the period of the contract exceeds three years, the bylaws and the contracts executed thereunder shall specify a reasonable period, not less than ten days in each year, after the third year, during which the member, by giving to the association such reasonable notice as the association may prescribe, may withdraw from the association; provided, that if the bylaws or contracts executed hereunder so specify a member may not withdraw from the association while indebted thereto. In the absence of such a withdrawal provision, a member may withdraw at any time after three years.

In conformity with the above statutory mandate, the Dairy Association adopted its by-law No. 8, entitled "Withdrawal":

WITHDRAWAL: There shall be designated in the Marketing Contract a period of ten days in each year during which the member may withdraw, by serving upon the Association written notice of intention to withdraw.

This statutory right of withdrawal afforded to each member is also inserted into the "Membership Application and Agreement" signed by each member when he applies for membership. It there provides:

It is also understood and agreed that this agreement shall remain in force and effect for one year from date and shall be terminated then only by *either party* giving the other party notice in writing that it intends to abandon this contract between the first and tenth day, inclusive, of the month of June.

(Emphasis added.) It is to be noted that the above provision extends the annual right of withdrawal to the Association as well as to the member. Likewise, in the producer's agreement with the Association, the same annual right of withdrawal is afforded to each party. Paragraph XIII provides:

This contract shall remain in force for a period of ten (10) years from date, unless cancelled in writing by *either party* between the first and tenth day, inclusive, of the month of June of any year, written notice of such cancellation to be served upon the opposite party, provided, that a member may not cancel this contract and withdraw from the Association while indebted thereto. This contract shall be automatically renewed for an additional period of ten years unless sooner cancelled in the manner set forth in this paragraph.

(Emphasis added.)

In summary, while section 3–1–17 and by-law 8 guarantee the member his basic right to withdrawal annually, should he choose to do so, the membership application and agreement and the producer's agreement also extend that right to the Association. There being no restriction in the statutes or in the articles of incorporation or by-laws against the Association's enjoying that right, the Association and the member/producer were free to include it in their contract. Section 3–1–17 and by-law No. 8 are part of the members' "Bill of Rights" and do not purport to deal with or preclude the Association from enjoying the annual right of withdrawal, if contractually conferred. In essence, membership in the Association and the term of the producer's agreement are for a one-year period, but they are automatically renewed annually unless the member or the Association affirmatively acts to terminate them. Unless either the member or the Association opts out, membership and the contract could remain in force for as long as twenty years.

The majority opinion recognizes the annual right of the member to withdraw, but denies this same right to the Association although the rights of both parties spring from the same language in the membership application and agreement and in paragraph XIII of the producer's agreement. Nothing could be clearer than that both parties have that right unconditionally. The majority has confused this annual right to opt out with the unrelated right of the Association under article IV of its articles of incorporation to terminate a mem-

bership and the producer's agreement for cause:

Article IV

. . . .

Termination

The Board of Directors by a three-fourths (¾) vote may for cause determine that it is for the best interests of the Association that any membership contract may be terminated. Termination of any producer's marketing contract shall thereby terminate such person's membership in the Association.

By-law No. 7 similarly affords the Board the right to terminate a membership at any time when good cause is found:

TERMINATION OF MEMBERSHIP: The association shall have the right to terminate and cancel memberships whenever it appears to the Board that the holder thereof is ineligible to hold the same, or that he has violated the Articles of Incorporation, the By-laws, the Marketing Contract, or other regulations of the Association.

It is to be noted that since the expulsion must be for cause, it can occur at any time and is not limited to or related in any way to the unqualified privilege during the first ten days of June to opt out and decline to renew the contract and membership for another year. Significantly, article IV and by-law No. 7 are entitled "Termination," whereas by-law No. 8 is entitled "Withdrawal."

The majority seriously errs in merging the two separate and distinct rights and in then concluding that the annual right of the Association not to renew a producer's agreement must be for cause, but the producer may elect not to renew for any reason or no reason at all. The net result of the majority opinion is that the Association is locked into a twenty-year contract with the member/producer unless the Association can find good cause to expel him. This would be a highly incongruous result and one which it appears the parties did not intend. It is abundantly clear that by-law No. 7, dealing with expulsion from membership for cause, and paragraph XIII of the producer's agreement and the member-ship application and agreement, conferring the annual right of each party not to renew the contract for another year, do not deal with the same subject and should not be merged in their application.

Inasmuch as the Dairy Association gave written notice to plaintiff during the first ten days of June in 1982 (and again in 1983) that it elected not to renew the annual agreement, pursuant to section XIII, the legal relationship of plaintiff and defendant ended. It is true that in 1982 the notice came on the heels of the May 26, 1982, resolution by the Association's Board of Directors, but the notice did not refer to or depend upon the resolution. The notice of nonrenewal by its very terms was pursuant to paragraph XIII and did not spring from any violation by plaintiff of the May 26 resolution, although plaintiff's refusal to pay the assessment may well have motivated the Association to exercise its right to opt out of the producer's agreement.

I would affirm the judgment of the trial court upholding the right of the Association not to renew its contract with plaintiff and would award the Association attorney fees (under paragraph VI) which it incurred in enforcing its right to opt out of the producer's agreement.

Under the view that I take of this case, it is unnecessary for us to decide the validity of the May 26 resolution. However, as an aside, it does not work the discrimination contended for by the majority opinion. On the contrary, my view of the resolution is that it imposes upon Utah members of the Association the same obligation as is imposed upon Idaho members to pay a 1 percent fee for the promotion of the sale of dairy products. Idaho producers are required by Idaho law to pay the fee, and they have no statutory right of refund. Since Utah members have the right of refund and some members were exercising that right, the May 26 resolution endeavored to bring equality by requiring the Utah producers who received a refund from the Utah Dairy Commission to pay that amount to the Association to promote sales. I therefore view the resolution as promoting equality rather than creating in-

equality as does the majority opinion. I find no support in the record for the assertion of the majority that the effect of the resolution is that Idaho members pay 2 percent and Utah members pay only 1 percent. Even plaintiff does not make that claim. His complaint is that the May 26, 1982, resolution was made effective retroactively by the Association so as to require him to pay to the Association his statutory refund for 1981, which he had already received. Since the Association did not rely on his disobedience of the resolution for its termination of the agreement with him, plaintiff's contention need not be answered. It should be observed, however, that plaintiff is a Utah producer and the resolution could not discriminate against him even under the majority's interpretation of it.

DURHAM, J., concurs in the dissenting opinion of HOWE, J.