**ZIONS FIRST NATIONAL BANK, a Utah corporation, Plaintiff and Appellee,**

v.

**CLARK CLINIC CORPORATION, a Utah corporation, Defendant and Appellant.**

No. 20105.

Supreme Court of Utah.

Sept. 30, 1988.

James G. Clark, R. Craig Clark, Jr., Ray Phillips Ivie, Provo, for defendant and appellant.

M. Dayle Jeffs, Provo, for plaintiff and appellee.

HALL, Chief Justice:

Zions First National Bank ("Zions") initiated this action against Clark Clinic Corporation ("Clark") to collect on a promissory note executed by one of Clark's employees, using facsimile signature stamps of Clark's officers. Clark counterclaimed against Zions to recover funds which it alleged were wrongfully disbursed from Clark's account on checks with unauthorized endorsement and stamped facsimile signatures. The trial court granted Zions' motions for summary judgment, awarding it damages and dismissing Clark's counterclaim. Clark seeks reversal of the trial court's orders and entry of judgment in its favor or, alternatively, remand for trial on all issues.

## I. FACTS

When ruling on an appeal from an adverse decision on a motion for summary judgment, we inquire whether there is any genuine issue as to any material fact and, if there is not, whether the moving party is entitled to judgment as a matter of law.[1] Indeed, in *Merrill v. Cache Valley Dairy Association,*[2] we reiterated:

In reviewing the record on any appeal from summary judgment, we treat the statements and evidentiary materials of the appellant as if a jury would receive them as the only credible evidence, and we sustain the judgment only if no issues of fact which could affect the outcome can be discerned.[3]

With these principles in mind, the record supports the following facts. Prior to this lawsuit, Clark maintained a business checking account with Zions. The signature card filed with the bank required two signatures in order to validate a check drawn on that account. Beginning sometime between 1976 and 1978, and apparently unknown to Clark's principals, Clark's employee and "business manager," Robert Westover, began personally endorsing and cashing Clark's checks as well as using facsimile signature stamps to draw checks on Clark's corporate checking account. Clark purchased the signature stamps in order to endorse medical insurance forms,

---

1. *Merrill v. Cache Valley Dairy Ass'n,* 750 P.2d 539, 540 (Utah 1988).

2. 750 P.2d 539.

3. *Id.* at 540 (footnote omitted).

and Zions was not specifically authorized to honor checks drawn with the stamps, nor was Westover authorized to sign, endorse, or cash Clark's checks.

Nevertheless, over time, Westover's actions in this regard caused Clark's checking account to become approximately $20,000 overdrawn. Thereafter, and notwithstanding the fact that Clark had never obtained a loan from Zions or authorized the bank to allow an overdraft of its account, an officer of Zions recommended to Westover that Clark obtain a loan to cover the overdraft. Accordingly, Westover used the facsimile signature stamps to execute a corporate resolution authorizing a corporate loan and, in doing so, stamped personal financial statements and personal guarantees on behalf of Clark's officers. Westover then used the stamps to execute a promissory note for $25,000 in favor of Zions and on behalf of Clark. The bank deposited this money into Clark's checking account.

Clark's officers became aware of the loan in October 1978. At that time, Westover's employment had been terminated and Clark's account was again overdrawn. Clark closed its account and repudiated the promissory note on the grounds that it was executed without Clark's knowledge or authority.

Subsequently, Zions filed suit for recovery on the loan, and Clark counterclaimed to recover funds disbursed on checks with unauthorized endorsements and signatures. In granting summary judgment dismissing Clark's counterclaim, the trial court stated:

1. In this matter the Court finds that the stamped signatures on the checks paid by the plaintiff bank are within the purview of the requirements of the signature card contract between the plaintiff and the defendant.

2. There is now no dispute that the stamped signatures were placed on the checks by the defendant's fiduciary.

3. The bank is not obligated to inquire into whether the fiduciary is honest or whether he is acting within the scope of his employment.

4. The Court finds the *Sugarhouse Finance Company* [4] case cited in plaintiff's Memorandum applicable to the facts now before the Court and the bank is not guilty of lack of due care in paying the checks in question when considered in light of the facts before the Court, the *Sugarhouse Finance Company* case, and applicable sections of the Utah Commercial Code.

The court also entered an order *in limine* restricting the evidence that Clark could present at trial.

Finally, the court granted Zions' motion for summary judgment on its cause of action and noted: "The reasoning of the *Sugarhouse Fin. Co.* case and the wording of the Uniform Fiduciaries Act clearly establish that the extent of the agent's authority is not controlling nor [sic] material."

## II. APPLICATION OF THE UNIFORM COMMERCIAL CODE

■ The applicability of the Uniform Commercial Code ("UCC") to this action has not been extensively argued by the parties. Indeed, the briefs on appeal do not agree on which sections of the Code are of primary importance here. However, the parties have implicitly assumed that the Code applies.[5] To place this case in perspective, then, it is necessary to review and analyze those provisions of the UCC which determine the rights and responsibilities of banks and their customers. In doing so, we, as did the Ohio Supreme Court, "remain cognizant that the Uniform Commercial Code is a delicately balanced statutory scheme designed, in principle, to ultimately shift the loss occasioned by negotiation of a forged instrument to the party bearing the responsibility for the loss." [6] Also, we are mindful of the fact that

4. *Sugarhouse Fin. Co. v. Zions First Nat'l Bank,* 21 Utah 2d 68, 440 P.2d 869 (1968).

5. *See Bridgeport Firemen's Sick and Death Benefit Ass'n v. Deseret Fed. Sav. & Loan,* 735 F.2d 383, 386 (10th Cir.1984).

6. *Ed Stinn Chevrolet v. National City Bank,* 28 Ohio St.3d 221, 226, 503 N.E.2d 524, 530 (1986), *modified on other grounds,* 31 Ohio St.3d 150, 509 N.E.2d 945 (1987).

[w]here a depositor has placed money in a checking account to be disbursed on his order, the bank requires that he fill out his card bearing the authorized signature, or signatures, upon which checks will be paid; and the only protection the depositor has is his reliance on the universally accepted practice and rule of law based thereon that the drawee is obligated to know the signature of its depositor and pay out his money only on his order and when the signature is *authorized* and genuine.[7]

This relationship between the bank and its customers mandates that the bank pay out funds only in strict accordance with each customer's orders.[8] Consequently, a bank may not charge a customer's account for an instrument containing a forged and/or unauthorized signature.[9]

Under the provisions of UCC section 3–401(1),[10] a person is not liable on an instrument unless his or her signature appears on it. Additionally, under section 3–404, an unauthorized signature is wholly inoperative as that of the person whose name is signed unless he or she ratifies it or is otherwise precluded from denying it.[11] In view thereof, the issues in this case involve whether the signatures on the documents and instruments herein were authorized [12] and then, assuming they were not autho-

rized, whether Clark is precluded from asserting lack of authorization or whether it ratified the same.[13]

## A. AUTHORIZATION ISSUE

As defined in UCC section 1–201(43), an unauthorized signature or endorsement is "one made without actual, implied or apparent authority and includes a forgery." The UCC also expressly provides that its terms may be supplemented by general principles of law and equity unless a particular provision indicates otherwise.[14] Therefore, in considering the issue of authority, we look to general principles of agency law.[15]

 Under agency law, an agent cannot make its principal responsible for the agent's actions unless the agent is acting pursuant to either actual or apparent authority.[16] Actual authority incorporates the concepts of express and implied authority.[17] Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf.[18] Implied authority, on the other hand, embraces authority to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent.[19] Im-

---

7. *W.P. Harlin Constr. Co. v. Continental Bank & Trust Co.,* 23 Utah 2d 422, 427, 464 P.2d 585, 588 (1970) (emphasis added; footnote omitted).

8. *Read v. South Carolina Nat'l Bank,* 286 S.C. 534, 335 S.E.2d 359, 361 (1985).

9. *Id.; see also* Utah Code Ann. § 70A–4–401 (1980); *Perini Corp. v. First Nat'l Bank of Habersham County,* 553 F.2d 398, 405 (5th Cir. 1977).

10. All references to sections of the Uniform Commercial Code may be found in title 70A of Utah Code Ann. (1980).

11. *See also* Utah Code Ann. §§ 70A–1–205, 3–403, –419, 4–103 (1980).

12. Although Zions claims that "[s]ince the ruling of the trial court was predicated upon the defendant's ratification [of the loan agreement and promissory note], the issue of apparent or implied authority is immaterial and irrelevant to this appeal," it is clear from the explicit rulings in the court's signed minute entries that

its decisions were based upon other grounds noted. Additionally, the scope of the agent's authority is relevant and subject to review. *See* Utah Code Ann. §§ 70A–3–401, –404 (1980); *infra* pages 1098–1100.

13. *Bridgeport Firemen's,* 735 F.2d at 387.

14. Utah Code Ann. § 70A–1–103 (1980).

15. *See id.*

16. *See Municipal Bldg. Auth. v. Lowder,* 711 P.2d 273, 279 (Utah 1985) (citing Restatement (Second) of Agency §§ 26, 27 (1958)).

17. *See* Restatement (Second) of Agency § 7 comment c (1958).

18. *See id.; Jones v. Van Norman,* 513 Pa. 572, 522 A.2d 503, 511 (1987) (Hutchinson, J., dissenting).

19. *Bowen v. Olsen,* 576 P.2d 862, 864 (Utah 1978).

plied authority is actual authority based upon the premise that whenever the performance of certain business is confided to an agent, such authority carries with it by implication authority to do collateral acts which are the natural and ordinary incidents of the main act or business authorized.[20] This authority may be implied from the words and conduct of the parties and the facts and circumstances attending the transaction in question.[21]

■ In comparison, an agent's apparent or ostensible authority flows only from the acts and conduct of the principal.[22] Indeed, as we stated in *City Electric v. Dean Evans Chrysler–Plymouth* : [23]

> Where corporate liability is sought for acts of its agent under apparent authority, liability is premised upon the corporation's knowledge of and acquiescence in the conduct of its agent which has led third parties to rely upon the agent's actions. Nor is the authority of the agent "apparent" merely because it looks so to the person with whom he deals. It is the principal who must cause third parties to believe that the agent is clothed with apparent authority.... It follows that one who deals exclusively with an agent has the responsibility to ascertain that agent's authority despite the agent's representations.[24]

Utilizing comparable rules of agency law in a case involving negotiable instruments, one court has stated:

> [A]ny appearance of [the agent's] authority came solely from [the agent] himself.

Thus the bank officer's reliance on the appearance of authority was unreasonable. It is well-established that the mere fact that an employee has managerial status and is in charge of a company's office does not entitle third persons to assume that he had the authority to execute or endorse negotiable paper belonging to his employer.[25]

Also, in a case similar to the instant one, another court held: "The furnishing of a rubber stamp bearing the name and address of the principal, a commonplace occurrence, did not cloak [the agent] with apparent authority to endorse corporate checks and receive payment for them. Whatever appearance of authority the stamp created arose from the actions of [the agent] himself and not [the principal]." [26]

■ Applying the above principles to the case at hand, we note that Zions' vice president stated under oath, "Plaintiff does not know of any specific authorization for Zions First National Bank to accept stamped signatures on defendant's checks." Also, Clark claimed that Zions cashed several checks with unauthorized endorsements and that Clark was damaged by all of the above. And regarding the loan in question, Clark's officers indicated that "Westover was never authorized to sign promissory notes or in any other way arrange loans for Clark or borrow money on Clark Clinic credit." While other portions of the record further support Clark's claim that the signatures were unautho-

**20.** *Id.*

**21.** *Id.*

**22.** *City Elec. v. Dean Evans Chrysler–Plymouth,* 672 P.2d 89, 90 (Utah 1983).

**23.** 672 P.2d 89.

**24.** *Id.* at 90 (citations omitted); *see also Walker Bank & Trust Co. v. Jones,* 672 P.2d 73, 75 (Utah 1983), *cert. denied sub nom. Harlan v. First Interstate,* 466 U.S. 937, 104 S.Ct. 1911, 80 L.Ed. 2d 460 (1984) ("Apparent authority exists: 'where a person has created such an appearance of things that it causes a third party reasonably and prudently to believe that a second party has the power to act on behalf of the first person....'") (footnote omitted).

**25.** *Confederate Welding v. Bank of the Mid-South,* 458 So.2d 1370, 1375 (La.App.1984) (citation omitted); *see also Pargas, Inc. v. Estate of Taylor,* 416 So.2d 1358, 1362–64 (La.Ct.App. 1982), and cases cited therein.

**26.** *Pargas,* 416 So.2d at 1362; *see also Empire Moving and Warehouse Corp. v. Hyde Park Bank & Trust Co.,* 43 Ill.App.3d 991, 999, 2 Ill.Dec. 753, 759, 357 N.E.2d 1196, 1202 (1976) ("Stamps of this type are in common use and if there was any appearance of authority it was created only by the [agent] and not by [the principal]" (citation omitted).); *Passaic–Bergen Lumber Co. v. United States Trust Co.,* 110 N.J.L. 315, 317–18, 164 A. 580, 581 (1933).

rized,[27] the above facts alone evidence that under our existing rule, summary judgment was inappropriately granted in this case.

## B. PRECLUSION ISSUE

■ Although, as noted, a bank is liable under its contract of deposit for payments which are not "properly payable" because of forged signatures, endorsements, or alterations, equitable principles incorporated into the UCC provide that in particular cases, a person's negligence may preclude him or her from asserting the existence of unauthorized signatures against banks and other parties.[28] As such, UCC section 3–406 provides:

> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

The degree of negligence necessary to support this defense is an issue reserved for the fact finder on a case-by-case basis.[29] However, Official Comment 7 to UCC section 3–406 notes that one of the most obvious cases of drawer negligence which may preclude recovery from a drawee bank occurs when a drawer "makes use of a signature stamp or other automatic signing device and is negligent in looking after it." This section also extends to situations where the drawer "has notice that forgeries of his signature have occurred and is negligent in failing to prevent further forgeries by the same person." [30]

In granting summary judgment dismissing Clark's counterclaim, the trial court did not specifically determine the applicability of section 3–406 or the factual issue of whether Clark was negligent in "substantially contributing" to the making of the "unauthorized" signatures in question.[31] Nevertheless, this defense to a customer's claim usually arises, if ever, from negligence occurring before or pursuant to the presentment and payment of the instruments by the bank and/or concerning the process by which the instruments were issued.[32] Also, as other courts recognize, section 3–406 only "protects parties who act not only in good faith but also in observance of the reasonable standards of their business. Thus, any bank which takes or pays an altered check which ordinary banking standards would require it to refuse cannot take advantage of the estoppel afforded by this Section." [33]

Additionally, in comparison to the provision referred to above, section 4–406 of the UCC may preclude a party's recovery if it failed in its statutory duty to discover the unauthorized signatures *after* the bank

---

**27.** Although there is some question whether in making its initial decision dismissing Clark's counterclaim the trial court had access to the depositions in this case, Zions cites to the depositions to support its argument that summary judgment was appropriately granted, and sworn statements therein further support our determination on appeal.

**28.** *See Winkie v. Heritage Bank of Whitefish Bay,* 99 Wis.2d 616, 622, 299 N.W.2d 829, 833 (1981); *see also supra* note 11 and accompanying text.

**29.** *Chicago Heights & Currency Exchange, Inc. v. Par Steel Prod. & Serv. Co.,* 123 Ill.App.3d 1054, 1055, 79 Ill.Dec. 275, 276, 463 N.E.2d 829, 830 (1984).

**30.** *See Key Bank v. First United Land Title Co.,* 502 So.2d 1280 (Fla.App.1987); *Winkie,* 99 Wis. 2d at 622–24 n. 5, 299 N.W.2d at 833–34 n. 5.

**31.** *See Winkie,* 99 Wis.2d at 622, 299 N.W.2d at 833.

**32.** *Id.*

**33.** *Confederate Welding,* 458 So.2d at 1376; *accord Empire Moving & Warehouse,* 43 Ill.App.3d at 997, 2 Ill.Dec. at 757, 357 N.E.2d at 1200; *Consol. Pub. Water Supply v. Farmers Bank,* 686 S.W.2d 844, 854 (Mo.App.1985); *Salsman v. National Community Bank of Rutherford,* 102 N.J. Super. 482, 493–94, 246 A.2d 162, 168 (Law Div.1968), *aff'd,* 105 N.J.Super. 164, 251 A.2d 460 (App.Div.1969); *Ed Stinn Chevrolet,* 28 Ohio St.3d at 231–32, 503 N.E.2d at 534; *Read,* 335 S.E.2d at 363.

paid the checks and returned the applicable statements.[34] That section provides:

(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

(a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement [were] available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

(4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration.

(5) If under this section a payor bank has a valid defense against a claim of a customer upon or resulting from payment of an item and waives or fails upon request to assert the defense the bank may not assert against any collecting bank or other prior party presenting or transferring the item a claim based upon the unauthorized signature or alteration giving rise to the customer's claim.

■ Under this section, a depositor is obligated to "exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and ... notify the bank promptly after discovery thereof." Failure to do so within the requirements of the section may preclude a depositor from asserting the unauthorized signature or lack of authorization against the bank. Importantly, as the court in *Key Bank v. First United Land Title Co.*[35] stated, "Whether the customer's activities reasonably prevented it from examining the ... statement sooner, and whether waiting three weeks to examine the statement contravenes the requirement of 'promptness' are ... questions for the trier of fact to resolve." [36]

■ Nevertheless, even if a bank succeeds in establishing a depositor's negligence, the preclusive effect of section 4–406 does not apply absent good faith payment by the bank or if the customer establishes that the bank failed to exercise ordinary care in paying the checks. In this regard, "good faith" is defined in section 1–201(19) as "honesty in fact in the conduct or transaction concerned," and section 4–103 provides that action or nonaction consistent with general banking usage and reasonable business standards constitutes

---

**34.** *See Winkie,* 99 Wis.2d at 626, 299 N.W.2d at 835.

**35.** 502 So.2d 1280.

**36.** *Id.* at 1284 (citation omitted).

the exercise of ordinary care.[37]

█ Applying the above principles to the instant case, the record indicates that genuine issues of material fact exist at least concerning whether Clark was negligent and substantially contributed to the making of the unauthorized signatures, whether Clark examined reasonable care and promptness in examining its statements and the documents involved, whether Zions received timely and appropriate notification from Clark under the applicable UCC provisions or suffered a loss pursuant thereto, and whether Zions' actions lacked ordinary care, were commercially reasonable, and were exercised in good faith. Such questions are for the trier of fact[38] and necessarily preclude this Court from affirming summary judgment as well as the motion *in limine* in this case.

### C. RATIFICATION ISSUE

Notwithstanding the facts noted above, Zions contends that Clark ratified the unauthorized checks and promissory note at issue in this case. However, because there exist unresolved questions of material fact and since the record indicates that the court's rulings for summary judgment were not actually based upon ratification, summary judgment would be inappropriate on this ground. Nevertheless, on remand we reiterate:

A principal may impliedly or expressly ratify an agreement made by an unauthorized agent. Ratification of an agent's acts relates back to the time the unauthorized act occurred and is sufficient to create the relationship of principal and agent. A deliberate and valid ratification with full knowledge of all the material facts is binding and cannot afterward be revoked or recalled. However, a ratification requires the principal to have knowledge of all material facts and an intent to ratify. Under some circumstances failure to disaffirm may constitute ratification of the agent's acts.[39]

Similarly, in *Lowe v. April Industries, Inc.*,[40] we indicated, "Ratification is express[ ] or implied. Implied [ratification may arise] under circumstances of acquiescence or where a duty to disaffirm is not promptly exercised. Knowledge, usually, is a requisite to any form of ratification."[41] Also, in *Ercanbrack v. Crandall–Walker Motor Co.*,[42] we stated:

[The principal] cannot be estopped by failing to take some positive action about a matter which the evidence shows the [principal's] officer or sales manager had no knowledge. The authorities cited by plaintiff assume that the principal knows that another has purported to act as his agent, or after receiving information that an act had been done without actual or apparent authority is not bound by that act under the law of agency unless he ratifies the act. Ratification of an act about which the principal knows nothing is inherently impossible.[43]

█ Applying these general ratification principles to the law of negotiable instruments, other courts have held:

The general rule is that the laxity of an employer in supervision of the performance of employees' duties does not afford a defense to a bank which has accepted checks on an endorsement forged by the employee as the primary obligation to determine whether there is a forged endorsement is rightly placed on the bank whose business is banking.

---

37. *See Read,* 335 S.E.2d at 363; *Mercantile Stores Co. v. Idaho,* 102 Idaho 820, 822, 641 P.2d 1007, 1009 (App.1982).

38. *K & K Mfg. v. Union Bank,* 129 Ariz. 7, 9, 628 P.2d 44, 46 (App.1981).

39. *Bradshaw v. McBride,* 649 P.2d 74, 78 (Utah 1982) (citations omitted); *see also City Elec.,* 672 P.2d at 91 (ratification requires knowledge of all material facts and intent to ratify).

40. 531 P.2d 1297 (Utah 1974).

41. *Id.* at 1299 (footnotes omitted).

42. 550 P.2d 723 (Utah 1976).

43. *Id.* at 725 (footnote omitted).

... The established law throughout the country is that the payor or bank must pursue the forger and bear any ultimate loss under such circumstances.[44] A bank clearly cannot establish a custom and confer authority upon an unauthorized agent by "recognizing the agent's acts over a period of time and then relying upon such custom as conferring apparent authority in absence of the employer's knowledge of the custom."[45]

Nevertheless, Zions argues that Clark ratified the promissory note in question since "a principal may not retain the benefits of a contract entered into by an alleged unauthorized agent and still repudiate the contract." This rule, however, is neither entirely accurate nor applicable under the facts of the instant case. Indeed, the Restatement (Second) of Agency (1958) correctly states the rule as follows:

Section 98. Receipt of Benefits as Affirmance

The receipt by a purported principal, *with knowledge of the facts*, of something to which he would not be entitled unless an act purported to be done for him were affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such receipt he repudiates the act. If he repudiates the act, his receipt of benefits constitutes an affirmance at the election of the other party to the transaction.

Section 99. Retention of Benefits as Affirmance

The retention by a purported principal, *with knowledge of the facts and before he has changed his position*, of something which he is not entitled to retain unless an act purported to be done on his account is affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such retention he repudiates the act. Even if he repudiates the act, his retention constitutes an affirmance at the election of the other party to the transaction.

(Emphasis added.) This rule is in keeping with that expressed previously by this Court in *Floor v. Mitchell*.[46] Therein, the defendants made an offer through the plaintiff's agent. The offer consisted of two contemporaneously drawn instruments. Although the agent failed to transmit one of the instruments, the principal was aware that a contract had been formed and accepted the same. In affirming the trial court's determination that the principal was also bound by the terms of the nontransmitted instrument, this Court stated: "When a principal claims the benefits of a contract made by his agent, he cannot repudiate the acts of this agent on the ground such acts were unauthorized. *Accepting a contract* and claiming the fruits thereof, the principal takes with whatever taint attaches to its origin."[47]

Further, *Antrim Lumber Co. v. Oklahoma State Bank*,[48] cited by Zions, is inapposite because therein the court held that "the defendant, having retained the proceeds of the note procured by the unauthorized act of its agent, *after learning of the facts* as shown by the evidence, ratified such transaction and became liable to the lender. The plaintiff, for that reason, was entitled to an instructed verdict."[49]

In the instant case, the facts, at least for purposes of summary judgment, argue against the determinations that Clark had "knowledge of all material facts and an intent to ratify"[50] and received or retained the proceeds after learning of the existence of the loan. Therefore, given these principles and the record facts as we

---

**44.** *Pargas,* 416 So.2d at 1362–63 (citations omitted).

**45.** *Id.* at 1363.

**46.** 86 Utah 203, 41 P.2d 281 (1935).

**47.** 86 Utah at 217, 41 P.2d at 287 (emphasis added; citations omitted).

**48.** 65 Okl. 25, 162 P. 723 (1916).

**49.** *Id.,* 162 P. at 725. The parties have not discussed the applicability of a forged signature or endorsement to the concept of ratification. *See generally Lowe,* 531 P.2d at 1298.

**50.** *Supra* note 39.

under our standard of review must consider them to be, the summary judgments and the order *in limine*, even if based upon ratification, were inappropriately granted in this case.

## III. APPLICATION OF THE UNIFORM FIDUCIARIES ACT

Finally, Zions argues that application of the Uniform Fiduciaries Act supports the granting of summary judgment in this case. We disagree.

The Uniform Fiduciaries Act was adopted in Utah in 1925 and is codified in chapter 1 of title 22 of the Utah Code. The purpose of the Act is to facilitate commercial transactions (in regard to negotiable instruments held in trust) by relieving depository banks and others dealing with authorized fiduciaries from the duty of insuring that entrusted funds are properly applied to the account of the principal.[51] By relaxing " 'some of the harsher rules which require of a bank and of individuals the highest degree of vigilance in the detection of a fiduciary's wrongdoing,' "[52] the Act provides relief for many who deal with authorized fiduciaries except where they know the fiduciary is breaching his or her duty to the principal involved or where they have knowledge of such facts that their action in dealing with the fiduciary amounts to bad faith.[53]

Although the parties have not effectively argued the application of the Act to the facts of this case, the trial court erroneously applied it in granting Zions' motions for summary judgment. As it has been previously noted:

[A] depository should not be allowed to utilize the Uniform Fiduciaries Act as an impenetrable shield against liability to which it has expressly agreed in assuming a contractual duty to scrutinize payments or deliveries to a depository-fiduciary. In short, the Act's protections against liability should not be extended to undermine contractual liabilities which are bargained for and expressly assumed.[54]

Also, as it relates to payments made to fiduciaries, the Act provides:

A person who in good faith pays or transfers to a fiduciary any money or other property *which the fiduciary as such is authorized to receive*, is not responsible for the proper application thereof by the fiduciary; and no right or title acquired from the fiduciary in consideration of such payment or transfer is invalid in consequence of a misapplication by the fiduciary.[55]

Other applicable provisions of the Act may also protect a bank in situations where (1) there is a transfer of negotiable instruments by a fiduciary;[56] (2) checks are drawn by a fiduciary and are payable to third persons;[57] (3) checks are drawn by or payable to a fiduciary;[58] (4) checks are drawn in the name of the principal;[59] and (5) deposits are made in a fiduciary's personal account.[60] Importantly, each of these provisions requires that for the principles involved to apply, the fiduciary must be empowered to endorse and/or draw such instrument or check on behalf or in the name of the principal or upon the principal's account. In other words, for the

---

**51.** *Sugarhouse Finance,* 21 Utah 2d at 69–70, 440 P.2d at 870.

**52.** *Trenton Trust Co. v. Western Sur. Co.,* 599 S.W.2d 481, 490 (Mo.1980) (en banc) (citations omitted).

**53.** *See* Utah Code Ann. § 22–1–1 (1984); *Research–Planning, Inc. v. Bank of Utah,* 690 P.2d 1130, 1132–33 (Utah 1984); *Trenton,* 599 S.W.2d at 492–93; *Pargas,* 416 So.2d at 1361–62; *Bridgeport Firemen's Sick & Death Benefit Ass'n v. Deseret Fed. Sav. & Loan,* 633 F.Supp. 516, 521–22 (D.Utah 1986).

**54.** *Robinson Protective Alarm Co. v. Bolger & Picker,* 512 Pa. 116, 516 A.2d 299, 305–06 (Pa. 1986) (Hutchinson, J., concurring).

**55.** Utah Code Ann. § 22–1–2 (1984) (emphasis added).

**56.** Utah Code Ann. § 22–1–4 (1984).

**57.** Utah Code Ann. § 22–1–5 (1984).

**58.** Utah Code Ann. § 22–1–6 (1984).

**59.** Utah Code Ann. § 22–1–8 (1984).

**60.** Utah Code Ann. § 22–1–9 (1984).

Uniform Fiduciaries Act to apply to this case, Westover must have been a fiduciary who was *authorized or empowered in fact* to endorse and/or sign the subject instruments and checks.[61]

▮ In this regard, an agent may qualify as a fiduciary under the Act.[62] However, the Act may shield a bank from negligence only when the bank knows that the party before it is acting for another.[63] Assuming then that the trial court correctly determined that Westover was a fiduciary under the meaning of the Act and that the bank knew he was acting as such, the most significant determination for purposes of our review and for deciding whether Zions may be shielded from liability under the Act is whether Westover was an *authorized* fiduciary empowered to conduct and consummate the transactions at issue.[64] This inquiry rests upon the determination of whether the fiduciary possessed such authority and not whether the bank had "knowledge as to whether or not it existed." [65]

In deciding a similar issue under somewhat comparable facts, the court in *Empire Moving & Warehouse v. Hyde Park Bank & Trust* [66] determined that the corporate agent involved was not an authorized fiduciary of the corporation because

> [t]he record shows that [the agent] was employed as a bookkeeper and that his authority extended only to depositing checks payable to plaintiff in plaintiff's bank account. He had no authority to

cash checks payable to plaintiff or to receive cash proceeds of such checks. [The agent's] practice of cashing payroll checks of plaintiff's employees does not in any sense imply that he was also authorized to cash checks payable to plaintiff. The authority to cash the payroll checks would, of necessity, have come only from the employees who owned the checks. Any negotiation of checks payable to plaintiff would necessarily be governed by the corporate resolution lodged with defendant [bank]. To exonerate [the bank] here it would be obliged to prove that [the agent] came into possession of the proceeds of the checks as a fiduciary *and that he had authority to endorse the checks.*[67]

▮ As noted above, Clark claims that Westover was not authorized to conduct the transactions in question and that as a result thereof, the trial court erred in determining that the Uniform Fiduciaries Act mandated summary judgment in this case. In view of the above concepts and given our established principles for determining the existence of authority generally, as well as the facts alleged in this case, genuine issues of material fact exist concerning whether Westover was an authorized fiduciary and whether in view of "ordinary prudence" and general "business practices and customs" or other factors, Zions, for all purposes, "knew" of such authorization

**61.** *See Bridgeport Firemen's,* 735 F.2d at 387–88; *Boutros v. Riggs Nat'l Bank,* 655 F.2d 1257, 1259 (D.C.Cir.1981); *National Bank v. Quinn,* 158 Ill. App.3d 694, 696–98, 110 Ill.Dec. 424, 426–27, 511 N.E.2d 259, 261–62 (1987); *Empire Moving & Warehouse,* 43 Ill.App.3d at 999–1000, 2 Ill.Dec. at 759, 357 N.E.2d at 1202; *Trenton Trust Co.,* 599 S.W.2d at 490–91; *Salsman,* 102 N.J.Super. at 495, 246 A.2d at 169; *Jones,* 522 A.2d at 508–09 n. 6; *Levy v. First Pennsylvania Bank,* 338 Pa.Super. 73, 487 A.2d 857, 861 (1985).

**62.** Utah Code Ann. § 22–1–1 (1984).

**63.** *See* Unif. Fiduciaries Act (prefatory note), 7A U.L.A. 391 (1985); *Levy,* 487 A.2d at 862 n. 13; *Boutros,* 655 F.2d at 1259; *Bridgeport,* 633 F.Supp. at 521.

**64.** *Supra* notes 55–61 and accompanying text; *Bridgeport,* 633 F.Supp. at 521–22.

**65.** *Jones,* 522 A.2d at 508–09 n. 6.

**66.** 43 Ill.App.3d 991, 2 Ill.Dec. 753, 357 N.E.2d 1196.

**67.** 43 Ill.App.3d at 999–1000, 2 Ill.Dec. at 759, 357 N.E.2d at 1202 (emphasis added; citations omitted); *Arvada Hardwood Floor Co. v. James,* 638 P.2d 828, 830 (Colo.App.1981). Although *Sugarhouse Fin. Co.,* 21 Utah 2d 68, 440 P.2d 869, is cited for the proposition that under the Act a bank may be relieved from any liability resulting from its own negligence in dealing with an unauthorized fiduciary, that case did not deal with the issue of an "unauthorized fiduciary" under the Act. *See also Bridgeport,* 633 F.Supp. at 521–22.

or acted in bad faith in regard thereto.[68]

Accordingly, the orders granting summary judgment and the motion *in limine* are vacated and set aside, and the case is remanded for further proceedings consistent with this opinion.

STEWART, DURHAM and ZIMMERMAN, JJ., concur.

HOWE, Associate C.J., concurs in the result.

68. *See supra* notes 52–53; *J & J Food Centers, Inc. v. Selig,* 76 Wash.2d 304, 309, 456 P.2d 691 (1969); *Boutros,* 655 F.2d at 1259.