22372

Emerson B. READ, As Managing General Partner of Lawton Bluff Company, a limited partnership, Appellant, v. SOUTH CAROLINA NATIONAL BANK, Respondent.

(335 S. E. (2d) 359)

Supreme Court

*Andrew Kenneth Epting, Jr.* of *Wise, Cole & Pearlman,* Charleston, *for appellant.*

*L. Henry McKellar* and *Stan McGuffin,* Columbia, *for respondent.*

Sept. 23, 1985.

*Per Curiam:*

Plaintiff-Appellant, Emerson B. Read, a managing partner of Lawton Bluff Company, a limited partnership, brings this action against the Defendant-Respondent, South Caro-

lina National Bank, to recover damages allegedly due because the bank paid out monies as a result of forged signatures on checks. The complaint alleges causes of actions for negligence and for conversion. In its answer, the bank alleged among other things that the Plaintiff-Appellant was precluded from asserting the unauthorized signatures because the negligence of the Plaintiff-Appellant substantially contributed to the making of the unauthorized signatures, South Carolina Code Annotated § 36-3-406, and the Plaintiff-Appellant failed to discover and report the forged signatures as required by this Code section.

After all evidence was submitted, the trial judge ██ granted the bank's motion for a directed verdict. He retained jurisdiction and prepared a formal order consistent with the directed verdict granted in open court. That order correctly sets forth and properly disposes of the issues which are before the court. We affirm. The relevant portions of that order are as follows:

"Lawton Bluff Company is a South Carolina Limited Partnership with Emerson B. Read and Thomas L. Read as its general partners. Emerson B. Read is the managing general partner. From February 26, 1975, it maintained a checking account No. 1001-44807 with SCN on which Emerson and Thomas were authorized to sign checks.

"In July of 1979, Read & Read, Inc., a corporation owned by Thomas and Emerson Read, hired Judy Bode as a sales secretary.[1] She was promoted to Executive Secretary shortly thereafter and primarily worked for Emerson Read. She was responsible for work flow in the office, helping hire and train secretaries and other general office work. She was also given the responsibility of handling a checking account entitled South Carolina Chapter of CCIM for Emerson Read, who was the treasurer of that organization.

"Beginning in December of 1979, Judy Bode began forging the signature of Emerson Read on checks drawn on the CCIM account making them payable to herself. Throughout 1980, she wrote approximately 36 checks on this account by

---

[1] [She, at the time, had been prosecuted, convicted and was on probation for issuing bad checks. Read was negligent in not investigating her background before giving to her important responsibilities.]

either forging Emerson Read's signature or making use of a rubber facsimile stamp.

"Judy Bode was also placed in charge of Emerson Read's personal checking account and on April 11, 1980, she was given signing authority on the account. In March of 1980, Judy Bode began forging Emerson Read's signature on checks drawn on his personal account. She forged approximately fifteen in number, eleven of which were made payable to herself.

"Judy Bode was given responsibility for several other checking accounts of businesss owned or managed by the Reads, including the Lawton Bluff account. Her responsibilities were to prepare checks for the signature of one of the Read brothers, make deposits and reconcile the bank statements. She was given these additional accounts because of problems in the bookkeeping department which had too many accounts to handle.

"Because of a hunting accident [in which he lost his hand], Emerson Read obtained a rubber facsimile stamp of his signature which enabled him to sign checks in a more expeditious manner. Thomas Gaillard, Mr. Read's account officer at SCN, warned him against using a rubber stamp because of the possibility of misuse. On July 30, 1980, Emerson Read filed with SCN a new signature card for the Lawton Bluff account, which reflected that the bank was to pay checks bearing the rubber facsimile stamp with a hand written initial 'e' on the right hand side of the stamp signature. This rubber facsimile stamp was kept in Emerson Read's desk drawer to which Judy Bode had a key. The times the rubber facsimile stamp was used legitimately, Bode stamped the checks and Read added the initial 'e.'

"In September of 1980, Judy Bode began forging Emerson Read's signature on checks drawn on the Lawton Bluff account either by signing his name or using the rubber facsimile stamp. From September through December of 1980, Judy Bode forged Emerson Read's signature on fourteen checks made payable to herself, on two checks made payable to Marie Read (the wife of Emerson Read), on two checks made payable to CCIM and one check made payable to Thomas L. Read. Some of the checks did not contain the endorsement of the payee; however, all of the checks not

payable to Judy Bode were deposited into the account of the within named payee. Of the fourteen checks payable to Bode, thirteen were deposited into the account of her son, S. Troy Bode, at SCN, and one was deposited at First Federal Savings & Loan. None of the checks were cashed.

"The one additional check involved in his case was drawn on the account of Rivers, Jenkins & Buist, Attorneys at Law, at SCN payable to Lawton Bluff Company in the amount of $8,799.44. This check was deposited into an account entitled Royal Tern, at C & S Bank. Royal Tern was a company owned by Emerson and Thomas Read. It was not alleged that this check bore a forged signature but was incorrectly deposited with no endorsement.

"All checks written out of the Lawton Bluff account by Judy Bode occurred after Emerson Read began using the rubber facsimile stamp. Of the twenty checks involved, the facsimile stamp was used on sixteen checks.

"During this period of time, Judy Bode also forged Emerson Read's signature on checks in the Harborview Federal account, Lawton Point account, CCIM account and Emerson Read's personal account. Additionally, Judy Bode forged Emerson Read's signature on a Lawton Bluff account and Palmetto Shopping Center account with State Street Bank in Boston, Massachusetts, and on the Royal Tern account with C & S Bank of South Carolina.

"It was Bode's responsibility to reconcile the bank statements of all the accounts entrusted to her and there was no one given the responsibility to check behind her even though Read & Read had a separate bookkeeping department. It was undisputed that SCN mailed the statements, but it appears that Bode destroyed all of forged checks upon receipt from the bank. Read testified that no one compared the balance on the statement to the balance in the checkbook nor compared the number of checks in the statement with the number of checks written in the checkbook. He further testified that most of the time he never even opened the CCIM bank statement, otherwise "he would have caught those" [forgeries]. With the exception of the Royal Tern account at C & S bank, he never noticed any statements missing until the whole scheme was discovered in late January 1981.

"Although the Plaintiff couched his first cause of action in negligence, the relationship between a bank and its depositor is one of contract. This contractual relationship requires that the bank pay out funds only in accordance with the orders given by the depositor. Consequently, a bank may not charge the depositor's account for any checks containing a forged or unauthorized signature of the drawer. These rules have been incorporated into the Uniform Commercial Code. South Carolina Code of Laws § 36-4-401(1) provides that a bank may charge against its customer's account only an item which is properly payable. In § 36-3-401(1) no person is liable on an instrument unless his signature appears thereon. Section 36-3-404 provides that an unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is *precluded* from denying it. Thus, under the Code a bank breaches its agreement with its customer when it pays a check containing a forged or unauthorized signature of the drawer. It is this breach which constitutes the customer's cause of action against the bank to recover the sums paid out on checks bearing the forged signatures. *Hardex-Steubenville Corp. v. W. Pa. National Bank*, 446 Pa. 446, 285 A. (2d) 874 (1971).

"The defenses in this case were not that the signatures were genuine or authorized but that Read by his negligence substantially contributed to the making of the unauthorized signatures and that he failed in his duty to discover and promptly notify SCN of the forgeries and thus is precluded from denying the unauthorized signatures.

"The First Defense in this case was that the Plaintiff failed in his duty to discover and promptly notify SCN of the forgeries. This duty and the effect of the customer's failure to discharge it are set forth in § 36-4-406(1) and (2).

(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debt entries or holds the statement and items pursuant to a request of instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an

item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customers by subsection (1) the customer is precluded from asserting against the bank.

(a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

"These provisions impose a duty on the depositor to check his monthly statement for unauthorized signatures on checks. If a depositor fails to do so, after the first forged check and statement relating thereto is sent him, plus a reasonable period not exceeding fourteen (14) days, he is precluded from asserting the unauthorized signature against the bank, on any subsequent item containing an unauthorized signature by the same wrongdoer.[2] The burden of proof of the depositor's negligence is on the bank. See Comment 2 to § 36-4-406.

"The first forgery occurred on the Lawton Bluff account in September 1980 and would have been included in the bank statement mailed on October 1. The forgeries were not reported to SCN until January 26, 1981. Read is thus precluded from asserting forgeries which occurred after September 1980.

"The preclusion under § 36-4-406(1) and (2) does not apply if the bank is negligent in paying the items.

The preclusion under subsection (2) does not apply if the

---

[2] Once the depositor gives notice to the bank, he would be protected on any subsequent forgeries by the same person, but notice would not revive his right to restitution on the earlier forgeries as to which notice was not given.

customer establishes lack of ordinary care on the part of the bank in paying the item(s). § 36-4-406(3)

"The burden of proving the bank's failure to exercise ordinary care under § 36-4-406(3) in paying the items rests squarely on the customer. *Nu-Way Services, Inc. v. Mercantile Trust Company*, 530 S. W. (2d) 743 (Mo. App. 1975). The question becomes whether there was sufficient evidence to raise a jury issue as to the lack of ordinary care on the part of SCN in paying the checks. (Check paying is the determination of whether there are sufficient funds in an account and a review of the signature on the check. This process is performed by bank's central bookkeeping department and has nothing to do with tellers in local branches who do not have signature cards).

"Employees of SCN testified that when checks drawn on SCN accounts are received by SCN for payment, they are first processed through the computer where the account is automatically debited. After this, the individual checks are received in the check paying area where the check paying clerks file the checks in account number order in file trays. The accounts in those file trays are separated by plastic dividers which contain the signature card. At the same time the checks are filed in the trays, the signature on the check is compared to the signature card in the plastic guide. Check paying clerks are assigned to file checks for certain cities so they will become familiar with the accounts and the signatures.

"A quality control clerk performs a random checking behind those check paying clerks to insure that the checks are filed properly and that signatures are compared. If signatures do not match, they are pulled and placed on a return sheet and transmitted back to the local office.

"A representative from C & S Bank testified that their procedure is similar to that of SCN, but that the signature cards are kept in a separate place from where the checks are filed, and that signatures are only compared on checks over $10,000.00 unless the customer requests special instructions or there is an alert on the account. A representative of First National Bank testified that the procedures used by his bank were the same as those used by SCN. There was no other

testimony of any other method of detecting forgeries employed by any other banking institution.

"Although 'ordinary care' is not defined in the Code, § 36-4-103(3) provides that action or nonaction consistent with general banking usage constitutes ordinary care. The only evidence as to general banking usage came from SCN and its witnesses from the area banks. Read presented no evidence to refute that SCN's procedure was consistent with general banking usage. On the contrary, Read's expert witness testified that SCN was more careful than the average bank in its examination of signatures. The only reasonable inference that could be drawn from the evidence is that SCN exercised ordinary care in paying the checks.

"The Second Defense is set forth in S. C. Code of Laws § 36-3-406.

> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

"The evidence in this case clearly presents a situation where Read's negligence as a matter of law substantially contributed to the forgeries. He was negligent in failing to maintain proper control over the signature stamp, he allowed the same person who had possession of the checkbook to reconcile the statements with no supervision or verification and he failed to examine his bank statements. Had he examined the bank statement of the CCIM account at any time during the period January 1980 through August 1980 he would have discovered those forgeries and Bode would not have had the opportunity to forge checks on the Lawton Bluff account. SCN has clearly met its burden of proof on the issue of Read's negligence substantially contributing to the making of the unauthorized signatures.

"Under § 36-3-406 the bank additionally has the burden of proving that it paid the instrument in good faith and in accordance with reasonable commercial standards of its

business. Good faith is defined as 'honesty in fact' § 36-1-201(19). There is no dispute as to SCN's good faith in paying the instruments. For the reasons set forth above I find as a matter of law that SCN paid the checks in accordance with reasonable commercial standards of its business.

"The second cause of action was based on conversion. As stated earlier, all of the checks in the case contained forged drawer's signatures with the exception of the check drawn on the account of Rivers, Jenkins & Buist, payable to Lawton Bluff Company and deposited into the Royal Tern account at C & S Bank with no endorsement.

"As to the checks which contained forged drawer's signatures there can be no cause of action for conversion. Payment by a bank of checks bearing forged signatures constitutes a breach of its agreement with its customer. Conversion of an instrument is specifically provided for in § 36-3-419(1)(c) of the Code of Laws of South Carolina. The section states that an instrument is converted when it is paid on a forged endorsement.

"In *Perini v. First National Bank of Habershan, Co.*, 553 Fed. (2d) 398 (5th Cir. 1977), the Fifth Circuit, in a most celebrated case, held that in cases where a defective endorsement is accompanied by a forged drawer's signature, that the loss is a forged check loss and not an endorsement loss, and no liability could be assessed on the basis of the endorsement. The court further held that no sound basis exists for extending liability for handling the endorsement beyond the unlikely event of a claim of superior right to the payment under the instrument.

"In the present case all of the checks not made payable to Judy Bode were deposited into the account of the named payee and the checks made payable to Judy Bode were deposited into her son's account which was controlled by her. Therefore, the losses are a result of the forged drawer's signature, not the endorsements. Depository banks can supply the endorsement of its customer § 36-4-205.

"The check payable to Lawton Bluff Company for $8,799.46 was deposited into the Royal Tern account at C & S with no endorsement. Although the check was drawn on SCN, SCN could have no way of determining into which account at C & S the check was deposited. Liability for

accepting a check for deposit into an incorrect account lies with the depository bank.

"In viewing all of the evidence in the light most favorable to the Plaintiff, the only inference that can be drawn from the undisputed facts is that Read's negligence substantially contributed to the making of the unauthorized signatures and that Read failed to introduce any evidence and thus to carry his burden of proof that SCN failed to exercise ordinary care in paying the terms. The SCN's motion for directed verdict is hereby granted."

Affirmed.