1269

Herbert DENNIS, d/b/a Dennis Construction Company, Respondent v. The SOUTH CAROLINA NATIONAL BANK, Appellant.

(382 S. E. (2d) 237)

Court of Appeals

*L. Henry McKellar* and *Stan McGuffin,* Columbia, *for appellant.*

*Thomas E. McCutchen, Evans Taylor Barnette* and *G. Raymond McElveen, Jr.,* Columbia, *for respondent.*

Heard Oct 12, 1988.

Decided Dec. 12, 1988.

GARDNER, Judge:

Herbert Dennis, d/b/a Dennis Construction Company (Dennis), brought this action against South Carolina National Bank (SCN) to recover $83,414.16 representing 170 forged checks debited to his account. The jury returned a verdict for Dennis in the amount of $41,707.08. We affirm.

## FACTS

A cursory reading of the record reflects that Dennis talks in a very uneducated manner, has a sixth grade education and has limited experience in keeping business records. Dennis, at the time of the trial of this case, was 61 years old. He had been a construction worker until the Fall of 1984 when he started his own business as a cement subcontractor. He enjoyed a rather successful operation, employing up to 16 people. His 1985 gross income was about $135,000 and his 1986 gross income was about $265,000.

Before starting his business in 1984, Dennis had maintained only one "small" personal checking account. He opened a checking account for his business with the Fort Jackson Branch of SCN. Dennis testified that SCN charged a check of Denny Construction of Hilton Head Island against his account; he went to an SCN branch in Sumter where a Ms. Sylvia Prescott assisted him in getting the money credited back to his account. Dennis testified Ms. Prescott told him he should move his account to that branch and assured him, "we'll see that won't happen to you again." Dennis moved his account to the Sumter branch.

Dennis hired his niece, Debra Dennis, to handle his paper work, including writing the payroll checks and paying the taxes on the payroll. Dennis testified that he hired Debra

because she had completed business courses and because his own business experience and knowledge was basically limited to pouring cement. He claimed that he relied on and believed in Debra's recommendations and explanations about paperwork matters. He turned over to Debra his tax and unemployment notices and his unopened bank statements. Debra told Dennis and Dennis believed that Debra took the unopened bank statements to the IRS and that the IRS, through their computer, read the unopened bank statements and returned them to her. Dennis testified that Debra would, a few days after she carried the statements to the IRS, return them unopened to him. At that time he would review the enclosed checks to verify his signature; however, he never compared the checks to the statement and what it reflected because he "didn't know how to."

Between July 1985 and August 1986, Debra forged Dennis's signature on 170 checks, totalling $83,414.16. She evidently removed the forged checks from the bank statements and resealed the envelopes in which the bank statements were contained before returning the statements to Dennis.

Dennis testified that he kept his checkbook in a locked suitcase, but that he would occasionally leave it with Debra while he was away and would sign the payroll checks upon his return. He testified also that he observed blank stubs in his checkbook and reprimanded Debra for these mistakes but did not become suspicious.

Dennis testified that he opened his August 1986 bank statement upon receipt and discovered 17 forged checks. Dennis reported the matter to the bank and had Debra prosecuted.

After the forgery was discovered, Dennis hired a Ms. Carrie Lee Ardis to correct his books. Ms. Ardis compiled a list of the forged checks, which list is of record. From the list, it appears that Debra on the same day cashed multiple checks drawn on Dennis's account at SCN. The record reflects that 2 forged checks payable to Debra were presented to SCN on the same day on 39 separate occasions; that 3 forged checks payable to Debra were presented to SCN on the same day on 9 separate occasions; that 4 forged checks payable to Debra were presented to SCN on the same day on 4 separate occasions and that 5 forged checks payable to

Debra were presented to SCN on the same day on two occasions.

An SCN teller, Ms. Miller, testified that the tellers at SCN became suspicious of Debra's check cashing activity on at least one occasion and started to call Dennis, but refrained from doing so because Debra became agitated. It is SCN's policy to call a customer if there is a doubt regarding a check. An SCN teller can order a signature card to verify the signature on a check if needed. Moreover and importantly, Suzanne Bedenbaugh, the SCN teller who most often dealt with Debra, had a history of cashing forged checks and was in danger of losing her job because of this. Ms. Miller testified that Ms. Bedenbaugh was careless about forgeries and "just didn't care."

Ms. Bedenbaugh testified that she was assigned teller number 097 when she was employed at the Dutch Square SCN bank. An exhibit of record shows that some of the forged checks were cashed by Ms. Bedenbaugh as teller number 097. Ms. Bedenbaugh admits that she cashed five of Dennis's checks on one day payable to Debra and on another occasion she cashed in one day four forged checks payable to Debra; these checks were in numerical sequence.

SCN has a teller procedure manual which requires that checks drawn on SCN be cashed only if they are properly drawn and there are sufficient funds on deposit with SCN in the account on which the checks were drawn. This procedure is different from the procedure used in cashing checks drawn on other banks. SCN follows the procedure whereby the bank places a caution slip to alert SCN employees to examine an account more closely if a suspicion arises as to activity on the account. Such a caution was not placed on Dennis's account until after August 8, 1986, when Dennis discovered the forgeries.

Two SCN file clerks, assigned the duty of verifying checks, admitted they received no training as to forgeries. One file clerk admitted that if the signature on the check was close, she let it go through.

When checks drawn on SCN accounts are received by SCN, they are first processed through a computer where the account is automatically debited. The individual checks are then received in the processing department where the check

file clerks file the checks in account number order in file trays. The accounts in these file trays are separated by plastic dividers which contain the original signature card. When the clerks file these checks in the trays, they compare the signature on each check to the signature card in the plastic guide. The purpose of this inspection is to make sure the signature is there and that it corresponds with the signature card. Additionally, quality control personnel check behind the clerks for misfiles and missing signatures and randomly verify signatures on a daily basis.

The record reflects that SCN does not train its clerks to develop handwriting expertise; the clerks are simply instructed to compare the signatures on the checks to see if they are the same as those on the signature card.

There is of record testimony that Citizens and Southern National Bank (C & S) has a similar procedure and that perhaps the SCN system of debiting checks is a little better than the C & S system.

Dennis brought suit against SCN alleging, *inter alia*, that SCN was negligent in paying the forged checks. SCN patterned its defense on the case of *Read v. South Carolina National Bank*, 286 S. C. 534, 335 S. E. (2d) 359 (1985). We hold that the facts of this case are different from those of *Read* and further that certain language of *Read* is *obiter dictum*.

## ISSUES

The issues on appeal are whether (1) there is evidence of record to support the jury finding that the bank failed to use ordinary care in paying the forged checks and (2) the trial judge erred in failing to direct a verdict or grant judgment n.o.v. on the ground that Dennis was as a matter of law contributorily negligent.

## I.

In an action at law, on appeal of a case tried by a jury, the scope of review of this court extends merely to the correction of errors of law; a factual finding of the jury will not be disturbed on appeal to this court unless a review of the record discloses that there is no evidence which reasonably supports the jury's finding. *Townes Associates, Ltd. v. City of Greenville*, 266 S. C. 81, 221 S. E. (2d) 773 (1976).

Additionally, in reviewing the denial of a motion for a directed verdict or for a motion for judgment n.o.v., the evidence and all reasonable inferences which can be drawn therefrom must be viewed in the light most favorable to the prevailing party. *Graham v. Whitaker*, 282 S. C. 393, 321 S. E. (2d) 40 (1984).

Liability of a bank for paying forged checks is determined by the Uniform Commercial Code. Section 36-4-406(2), Code of Laws of South Carolina (1976), in pertinent part provides that a customer who fails to properly review a statement of account accompanied by the items (checks) paid which is sent to him by his bank will be precluded from recovering payment of the forged checks if he fails to notify the bank of the forgery within a reasonable period of time. The same section, however, provides in Section 36-4-406(3) the following:

> The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

It will be noted that the burden of establishing lack of ordinary care on the part of the bank is placed upon the customer, who was Dennis in this case. *Read v. South Carolina National Bank, supra.* Dennis was thus required to produce sufficient evidence to raise a jury issue as to the lack of ordinary care on the part of SCN in paying the forged checks. *Id.*

At this point, we observe that *Read* contained the following parenthesized language:

> (Check paying is the determination of whether there are sufficient funds in an account and a review of the signature on the check. This process is performed by the bank's central bookkeeping department and has nothing to do with tellers in local branches who do not have signature cards).

286 S. C. at 540, 335 S. E. (2d) at 362.

We construe the above as dictum, which is an expression or statement by the court on a matter not necessarily involved in the case nor necessary to a decision thereof. 21 C. J. S. *Courts* Section 190 (1940).

*Read* did not involve checks which were cashed by tellers.

The parenthesized language above quoted did not refer to a fact that was involved in *Read* and was not necessary to the decision of *Read*. And the general rule as to dicta above quoted is particularly applicable where there is a contrary statute. 21 C. J. S. *Courts* Section 190 (1940). In this situation there is a contrary statute.

Section 36-4-213(1), Code of Laws of South Carolina (1976), provides that "[a]n item is finally paid by a payor bank when the bank has done any of the following, whichever happens first: (a) *paid the item [check] in cash;* or ... (c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; ..." [Emphasis added.]

The process of posting, which is referred to in the above parenthesized quote from *Read,* is described by Section 36-4-109, Code of Laws of South Carolina (1976), as meaning "the usual procedure followed by a payor bank in determining to pay an item and in recording the payment" by, *inter alia,* verification of any signature. The Official Comment indicates that the purpose of Section 36-4-109, Code of Laws of South Carolina (1976), is to establish that the completion of the "process of posting" *is one of the measuring points for determining when an item is finally paid.* Additionally and importantly Section 36-4-213, defines the final payment of a check by a bank and included in this definition is the paying of a check *in cash* and/or the completed process of *posting* the check to the indicated account of the maker of the check, *whichever is done first.* Check paying, therefore, can have much to do with tellers in local branches. And we so hold.

The question then is whether there is evidence of record to support the thesis that the bank failed to exercise ordinary care in either cashing the checks or in the posting process. Ordinary care is not defined in the Uniform Commercial Code; Section 36-4-103(3), Code of Laws of South Carolina (1976), however, provides:

(3) Action or nonaction approved by this chapter or pursuant to Federal reserve regulations or operating letters constitutes the exercise of ordinary care and, in the absence of special instructions, action or nonaction consistent with clearing house rules and the like or with a general banking usage not disapproved by this chap-

ter, prima facie constitutes the exercise of ordinary care.

SCN failed to include in the transcript of record the trial judge's jury charge. It is the burden of the appellant, in this case SCN, to furnish a sufficient record on appeal from which this Court can make an intelligent review. *Windham v. Honeycutt*, 290 S. C. 60, 348 S. E. (2d) 185 (Ct. App. 1985). Where there is no exception to the court's charge to the jury in the trial of the case and it is not contained in the appeal record, the charge will be presumed to have contained instructions pertinent to the applicable principles and to have been free from prejudicial error. *Morrow v. Evans*, 223 S. C. 288, 75 S. E. (2d) 598 (1953). We can then but conclude that the trial judge charged the jury fully as to Section 36-4-103(3) and that the jury, after considering the facts of the case presented to them and the law as charged to them by the trial judge, awarded the verdict to Dennis, thereby rejecting the argument that SCN, in posting the forged checks, complied in its alleged performance or execution of the posting procedures it had in place.

First, SCN on appeal takes the position that the conduct of the tellers has nothing to do with the paying of the forged checks. We disagree with this contention for the reasons hereinbefore stated. And we further observe that SCN offered no evidence of reasonable commercial standards for banks or general banking usage relating to tellers paying forged checks.

As set forth under the subject of facts in this decision, there is evidence of record from which the inference may be drawn that SCN tellers failed to take precautionary measures in paying the forged checks presented to SCN for payment by Debra Dennis. To reiterate, SCN allowed a teller, who was known to be careless and to have cashed forged checks in the past, to cash multiple forged checks in the same day on numerous occasions. On other occasions, the tellers at SCN became suspicious of Debra's check cashing activity, but failed to contact Dennis in violation of SCN procedure. These facts constitute evidence which under our scope of review negates the alleged erroneousness of the trial judge's refusal to direct a verdict or grant judgment n.o.v. with respect to this aspect of the case, i.e., the negli-

gence of the tellers in cashing certain checks. And we so hold.

Not all the checks were cashed by the tellers. All of the checks, however, were posted. There is evidence of record that SCN did not give their file clerks training as to forgeries. One SCN clerk admitted that if the signature on a check was close, she would let it go through. The checks, when received by the department where the check file clerks worked, were filed in account number order in file trays and the plastic divider contained the original signature card. It was the testimony of SCN that their clerks were supposed to compare the signature on each check to the signature card in the plastic guide. The purpose of this inspection was to make sure the signature on the check corresponded with the signature card. The record reflects that the clerks failed on 170 separate occasions to discover the forgery of Dennis's signature.

We reiterate that the clerks failed to notice 2 forged checks payable to Debra which were presented to SCN on the same day on 39 separate occasions; 3 forged checks payable to Debra on the same day on 9 separate occasions; 4 forged checks payable to Debra on the same day on 4 separate occasions and 5 forged checks payable to Debra on the same day on 2 occasions. This repetitious failure by SCN clerks is evidence, we hold, supporting the jury's determination that SCN failed to exercise ordinary care in carrying out the duties which were part of the described general banking usage of SCN and C & S. The bank's procedure according to the testimony might well have conformed to general banking usage, but we hold that there is evidence of record to support the thesis and the verdict of the jury that ordinary care was not exercised by the employees of SCN in the execution of the banking posting procedure. And we so hold.

For the reasons stated, we reject SCN's contention that there is no evidence of record to support the finding of the jury that the bank failed to exercise ordinary care in paying the forged checks both with respect to some of the checks which were paid by the tellers and all of the checks which were posted. And we so hold.

## II.

SCN relies heavily on *Read* in which the Court held that the bank was not liable for the amount paid on forged checks where the account holder was contributorily negligent (1) in failing to maintain proper control over his signature stamp, (2) in allowing the person who had possession of the checkbook to reconcile the statements with no supervision or verification and (3) in failing to examine the bank statements. SCN argues that *Read* is "on all fours" with the present case. We disagree.

There was no signature stamp in the case on hand. Debra did not reconcile the bank statements. And Dennis under the circumstances of this case believed that he, himself, unsealed the bank statements and examined the signatures thereon.

Section 36-3-406, Code of Laws of South Carolina (1976) provides:

> **Section 36-3-406. Negligence contributing to alteration or unauthorized signature.**
>
> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

Since the trial judge's charge to the jury is not of record, we can only assume that the question of whether Dennis's negligence substantially contributed to the forgeries was submitted to the jury and resolved in Dennis's favor. *Morrow v. Evans, supra.* It is likewise true that we must assume that the question of whether SCN paid the forged checks in good faith and in accordance with the reasonable commercial standards of SCN and the general banking usage was submitted to the jury and resolved against the bank.

For the same reasons given above for our holding that there is evidence of record that SCN's clerks failed to exercise ordinary care in the execution of the posting procedures under which they worked, we hold that there is evidence of

record to support the jury's apparent finding that SCN did not pay the forged checks in good faith and in accordance with reasonable commercial standards of SCN and the banking business in general.

For the reasons stated, we reject the argument by SCN that Dennis's negligence substantially contributed to the forgeries.

### CONCLUSION

We hold that there is evidence of record to support the proposition inherent in the jury's verdict that (1) SCN's tellers failed to use ordinary care in cashing some forged checks, (2) SCN's posting clerks failed to use ordinary care in the execution of SCN's posting procedures and (3) Dennis by his negligence did not substantially contribute to the forgeries. For these reasons, the appealed judgment is affirmed.

Affirmed.

SANDERS, C. J., and GOOLSBY, J. concur.