A04A2080. SPACEMAKERS OF AMERICA, INC. et al.
v. SUNTRUST BANK.

(609 SE2d 683)

ELLINGTON, Judge.

Spacemakers of America, Inc. sued SunTrust Bank after the bank processed approximately 65 checks that had been forged by the company's bookkeeper. The trial court granted the bank's motion for summary judgment on Spacemakers' claims for negligence, conversion, and unauthorized payment of forged items. Spacemakers appeals, claiming the trial court erred when it misapplied the law, granted summary judgment on its tort claims, and found the bank was not negligent as a matter of law. Because summary judgment was properly granted in this case, we affirm.

> In reviewing a grant or denial of summary judgment, this Court conducts a de novo review of the evidence. To prevail at summary judgment under OCGA § 9-11-56 (c), the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmovant, warrant judgment as a matter of law.

(Footnote omitted.) *Baker v. Housing Auth. of the City of Waynesboro*, 268 Ga. App. 122 (601 SE2d 350) (2004). The record in this case shows the following undisputed facts: Jenny Triplett applied with Spacemakers for a bookkeeping position in November 1999. Triplett listed no prior employment on her application, and the application did not inquire about her criminal history. Prior to hiring Triplett, employees of Spacemakers did not ask her about her criminal history or conduct a criminal background check. Had it done so, Spacemakers would have learned that Triplett was on probation from a 1997 conviction for thirteen counts of forgery in the first degree, as well as from convictions for theft by taking and theft by deception in March 1999, just eight months before she applied for the Spacemakers job. All of these convictions were the result of Triplett forging the checks of previous employers.

Spacemakers hired Triplett as a bookkeeper on December 1, 1999, delegating to her the sole responsibility for maintaining the

company's checkbook, reconciling it with the monthly bank statements, and preparing financial reports. According to Dennis Rose, Spacemakers' president, Triplett also handled the company's accounts payable and regularly presented him with invoices from vendors and payroll records for employees. Rose stated that he spent several hours reviewing the vendor invoices each month before giving Triplett specific directions about which ones should be paid. After Triplett wrote the checks, she gave them to Rose so he could sign them. No other Spacemakers' employee, however, reviewed the monthly bank statements or looked at the company's checkbook register to ensure that Triplett wrote only authorized checks on the company's account. Further, Rose admitted that no other employee checked the accuracy of Triplett's financial reports and that he simply relied on Triplett's representations regarding how much money was in the bank account at any given time.

On January 3, 2000, just weeks after starting her job at Spacemakers, Triplett forged Rose's signature on a check for $3,000. She made the check payable to her husband's company, "Triple M Entertainment Group," which was not a vendor for Spacemakers. By the end of her first full month of employment, Triplett had forged five more checks totaling $22,320.30, all payable to Triple M. Then, over the next nine months, Triplett forged fifty-nine more checks totaling approximately $475,000. Triplett made all of these checks payable to Triple M. Most of the checks were for amounts between $5,000 and $10,000, and only two of the checks were for an amount over $20,000: a check for $24,500 dated September 1, 2000, and a check for $30,670 dated October 5, 2000. There is no evidence that anyone at Spacemakers other than Triplett reviewed the company's bank statements between January and October 2000 or that Spacemakers ever notified SunTrust that there had been any unauthorized transactions during that period.[1]

On October 13, 2000, a SunTrust loss prevention employee visually inspected the $30,670 check. She became suspicious of the signature and immediately contacted Rose. The SunTrust employee faxed Rose a copy of the check, which was made payable to "Triple M." Rose knew that Triple M was not one of the company's vendors and that he had not authorized the check. During the phone conversation,

---

[1] The company's total reliance on Triplett's financial reports, including its failure to look at the monthly bank statements or check the accuracy of the financial reports, is even more remarkable given testimony by Rose and his wife that the company experienced a "precipitous drop" in the company's cash assets during the spring and summer of 2000. During this period, the company barely had enough money to pay its bills and its checks sometimes "bounced," so the Roses opened up a line of credit with SunTrust in order to keep the company in business. Even so, they never investigated Triplett's bookkeeping to see if there had been unauthorized activity within the account.

a Spacemakers' employee reminded Rose that Triplett's husband owned Triple M. Rose's wife immediately called the police and Triplett was arrested.

On November 9, 2000, Spacemakers sent a letter to SunTrust demanding that the bank credit $523,106.03 to its account for the forged checks.[2] The bank refused, contending that Spacemakers' failure to provide the bank with timely notice of the forgeries barred its claim under the notice provisions of the account agreement between the bank and Spacemakers, as well as under the notice provisions of the Georgia Commercial Code, specifically OCGA § 11-4-406. The bank also contended that Spacemakers' negligence in hiring and failing to supervise Triplett, a convicted felon, barred the company's claim under OCGA §§ 11-3-406 and 11-4-406. Spacemakers subsequently sued the bank for negligence, conversion, and unauthorized payment of forged items.

In granting summary judgment to the bank, the trial court found that Spacemakers could not recover for the first forged check from January 2000 because it failed to notify the bank of the forgery within 30 days of receiving its bank statement, as required by OCGA § 11-4-406. The trial court also found that, under the same provision, Spacemakers could not recover for the 64 subsequently forged checks because they were all forged by the same person who forged the first check. Further, the court found that there was no evidence that the bank failed to exercise ordinary care in the payment of the checks. Spacemakers appeals.

1. Spacemakers claims the trial court erred in applying OCGA § 11-4-406 to the facts of this case. OCGA § 11-4-406 reads, in relevant part, as follows:

> (c) If a bank sends or makes available a statement of account or items . . . , the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

---

[2] Attached to its demand letter was a list of allegedly forged checks. Although Spacemakers included in the list a few suspicious checks that were payable to entities other than Triple M, the company did not include these checks in their suit against the bank.

> (d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c) of this Code section, the customer is precluded from asserting against the bank: (1) The customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and (2) The customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

In other words, this rule imposes upon a bank customer the duty to promptly examine its monthly statements and notify the bank of any unauthorized transaction. If the customer fails to report the first forged item within 30 days, it is precluded from recovering for that transaction *and for any additional items forged by the same wrong-doer.*[3] OCGA § 11-4-406 (d) (2); see also *Espresso Roma Corp. v. Bank of America*, 100 Cal. App.4th 525, 529 (1) (124 Cal. Rptr. 2d 549) (2002) (construing a parallel provision of the California Code);[4] *Marx v. Whitney Nat. Bank*, 713 S2d 1142, 1147 (1998) (construing a parallel provision of the Louisiana Code); *Globe Motor Car Co. v. First Fidelity Bank*, 273 N.J. Super. 388, 401 (II) (641 A2d 1136) (1993) (construing a parallel provision of the New Jersey Code); *Read v. South Carolina Nat. Bank*, 286 S.C. 534, 539 (335 SE2d 359) (1985) (construing a parallel provision of the South Carolina Code). The underlying justification for this provision is simple: one of the most serious consequences of the failure of a customer to timely examine its statement is that it gives the wrongdoer the opportunity to repeat his misdeeds. *Marx v. Whitney Nat. Bank*, 713 S2d at 1147 (quoting the official comments to the 1990 Uniform Commercial Code). Clearly, the customer "is in the best position to discover and report small forgeries before the [same] wrongdoer is emboldened and attempts a larger misdeed." (Footnote omitted.) Id.; see also *Globe Motor Car Co. v. First Fidelity Bank*, 273 N.J. Super. at 401 (II) (finding that the

---

[3] Construing a parallel provision of its Commercial Code, the South Carolina Supreme Court held that, once a customer notifies the bank of an unauthorized transaction, the customer would be protected on any future forgeries by the same person, but the late notice would not revive its right to restitution on the earlier forgeries. *Read v. South Carolina Nat. Bank*, 286 S.C. 534, 539, n. 2 (335 SE2d 359) (1985).

[4] It appears that the interpretation of OCGA § 11-4-406 (d) is a matter of first impression for the state.

wrongdoer's "successful series of forgeries over a three-year period is more fairly attributable to the folly and carelessness of the plaintiff in failing to detect the forgeries when the cancelled checks were returned to it than to the bank for paying the checks").

In this case, the undisputed evidence showed that Spacemakers hired as a bookkeeper a twice-convicted embezzler who was on probation, then delegated the entire responsibility of reviewing and reconciling its bank statements to her while failing to provide any oversight on these essential tasks. The bookkeeper started forging checks within weeks of taking control of the company's checkbook and, by the end of January 2000, had forged six checks totaling $25,320.30. Triplett made all of the checks payable to her husband's company, which had never been a Spacemakers' vendor. There is every reason to believe that, if Spacemakers had simply reviewed its bank statement for January 2000, it would have discovered the forgeries. More importantly, it would have been able to timely notify the bank of its discovery and avoided its subsequent losses of almost $475,000. Clearly, Spacemakers' extensive and unnecessary loss due to forgery is precisely the scenario that the duties created by OCGA § 11-4-406 were designed to prevent. Accordingly, we find that Spacemakers is precluded as a matter of law from asserting claims based upon the forgeries in this case. *Read v. South Carolina Nat. Bank*, 286 S.C. at 539. The trial court did not err in granting summary judgment to the bank.

2. Spacemakers also contends the trial court erred in finding that there was no evidence that the bank failed to use ordinary care in processing customers' checks. Specifically, Spacemakers claims a jury issue existed as to whether the bank was negligent because it did "absolutely nothing" to verify signatures on commercial checks written for less than $20,000. Further, Spacemakers argues that if *both* the customer and the bank are negligent, then the loss from the forged checks is allocated between the two parties according to the extent each party's negligence contributed to the loss. See OCGA §§ 11-3-406;[5] 11-4-406 (e).[6] Therefore, according to Spacemakers, the

---

[5] OCGA § 11-3-406 reads in relevant part:

(a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

(b) Under subsection (a) of this Code section, if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

[6] OCGA § 11-4-406 (e) reads in relevant part:

bank should be liable for at least part of the company's losses from the forged checks. In order to survive the bank's motion for summary judgment, however, Spacemakers had the burden of presenting some evidence to refute the bank's evidence that it complied with reasonable commercial standards of the banking industry and to show that the bank's negligence contributed to the company's losses. OCGA §§ 11-3-406 (c); 11-4-406 (e); *Read v. South Carolina Nat. Bank*, 286 S.C. at 540-541. As shown below, Spacemakers failed to carry this burden.

Under OCGA § 11-3-103 (a) (7),

"[o]rdinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage.

Ordinary care in this context is comparable to a "professional negligence" standard of care and does not refer to what a "reasonable person" would do under the circumstances. *Espresso Roma Corp. v. Bank of America*, 100 Cal. App.4th at 531 (2).

The bank, in support of its motion for summary judgment, presented a prima facie showing that it exercised ordinary care in this case. According to the affidavit of Jeffrey Dalrymple, a SunTrust Senior Vice-President, the bank's regional operations center handles between 650,000 and 1,200,000 checks per day, and its fraud detection software, ASI/16, is "an industry standard and one of the most sophisticated rules-based fraud detection software systems available." This fraud detection software program reviews every check written for $250 and over[7] and looks for certain suspicious characteristics which may indicate fraud on an account. These characteristics include, but are not limited to, the following: check numbers

---

If subsection (d) of this Code section applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with subsection (c) of this Code section and the failure of the bank to exercise ordinary care contributed to the loss.

[7] A SunTrust operations manager deposed that the system "filters" out checks under $250 before screening because it is unlikely that such checks are forged. Notably, none of the forged

that are out of sequence; checks that have duplicate, missing, or out-of-range serial numbers; checks for high dollar amounts; checks for an amount greater than average for the account; and checks for an amount which exceeds the largest found in the account's history. If a check meets any of these characteristics, it is "out sorted" and visually inspected by SunTrust employees.[8] Further, commercial checks for $20,000 or greater are automatically reviewed and verified by Sun-Trust employees. Dalrymple's affidavit also stated that he has personal knowledge of commercial standards in the banking industry in general and in the Atlanta area, as well as SunTrust's policies and procedures regarding the processing of checks. According to Dalrymple,

> SunTrust's standards with respect to thresholds for sight inspection of checks drawn on commercial accounts not only meet but are in fact more stringent than the standards for sight inspection of such checks among other banks in the Atlanta, Georgia area and are in observance and in fact exceed reasonable commercial standards.

Finally, Dalrymple's affidavit stated that SunTrust followed its standard procedures when it processed checks drawn on Spacemakers' account.

Once the bank presented a prima facie case demonstrating its exercise of ordinary care, the burden shifted to Spacemakers to respond with competent evidence that the bank failed to meet reasonable commercial standards in the banking industry. *Espresso Roma Corp. v. Bank of America*, 100 Cal. App.4th at 532 (2). The only evidence Spacemakers presented to refute SunTrust's showing was an expert witness, who testified that he had never analyzed fraud detection systems in any national bank in the Atlanta area. He also admitted that he did not know what fraud detection procedures SunTrust actually performs on commercial checks under $20,000. Even so, the witness deposed that, in his opinion, the bank was negligent because it did not visually inspect the signature on every check it processes, regardless of the check's amount. The expert witness later abandoned that position, however, and admitted that he did not think that reasonable commercial standards for national banks in the Atlanta area required banks to visually inspect every check. The witness had no opinion as to how large a check amount would have to be for the bank to be required to visually inspect it for

---

checks in this case was for an amount less than $250.

[8] Checks are also visually inspected for fraud for other reasons not applicable in this case.

fraud in order to comply with reasonable commercial standards in the Atlanta area. He also deposed that he was not aware of any provision in the Georgia Commercial Code which requires a bank to visually examine every check it processes. Further, although the expert witness claimed SunTrust was negligent for failing to notify its customers of its fraud detection policies and procedures, he admitted that he did not know what SunTrust told its customers, or what other banks in the area tell their customers, regarding their fraud detection program.

Accordingly, we find the record supports the trial court's conclusion that Spacemakers failed to create a jury issue as to whether the bank exercised ordinary care under the circumstances. *Espresso Roma Corp. v. Bank of America*, 100 Cal. App.4th at 533 (2).

3. We also find that, even if OCGA § 11-4-406 did not preclude Spacemakers from recovering from the bank, there was a second basis for granting summary judgment on the company's claims. See *R. W. Holdco, Inc. v. Johnson*, 267 Ga. App. 859, 866 (2) (601 SE2d 177) (2004) (a grant of summary judgment will be affirmed if it is right for any reason). The evidence showed that Spacemakers' commercial account with SunTrust was subject to certain terms, which were documented in a booklet entitled "Rules and Regulations [for] Non-Personal Deposit Accounts." The booklet expressly notified commercial customers that the bank does not verify the signatures on every check paid against their account and instructed customers to promptly examine their monthly statements to verify that only authorized checks have been paid. In fact, a second provision specifically detailed the customer's duty with regard to recognizing account discrepancies and its liability to fulfill this duty:

> You should carefully examine the statement and canceled checks (including the face and back), if included in the statement, when you receive the statement. The Bank will not be liable for any unauthorized signature, alteration, misencoding or other error on the face of any item in your statement, or for any incorrect amount or other error on the statement itself . . . unless you notify the Bank within thirty (30) calendar days from the date the Bank . . . makes your statement available to you or anyone to whom you request it be sent. . . . Moreover, because you are in the best position to discover an unauthorized signature . . . , you agree that the Bank will not be liable for paying such items if . . . you did not examine the statement and the canceled checks (if included) or you have not reported [the] unauthorized signatures . . . to us within the time period set forth above.

Most importantly, the booklet contained the following provision: "Bookkeepers. In the event you authorize any third person . . . to retain possession of or prepare items for [your company], you agree to assume full responsibility for any errors or wrongdoing by such third person . . . if the Bank should pay such items." Therefore, under these express provisions, Spacemakers cannot recover from the bank for the payments on the forged checks.

4. Spacemakers claims the trial court erred in finding that the company had failed to notify SunTrust of "any unauthorized signatures" within 30 days, as required by OCGA § 11-4-406.[9] It argues that, after the bank discovered the forged $30,670 check on October 13, 2000, the bank had notice of any forgeries that had occurred within the preceding 30 days, so the court's finding to the contrary is wrong. Spacemakers claims, therefore, that it should be able to recover for the 12 forged checks paid by the bank within that period. This issue, however, has already been decided adversely to Spacemakers in Division 1, supra, wherein we held that, under OCGA § 11-4-406 (d), a customer's failure to timely report a wrongdoer's first forgery precludes it from recovering for any subsequent forgery by the same wrongdoer. This is true even if the subsequent forgery is discovered and timely reported to the bank pursuant to OCGA § 11-4-406 (c). There was no error.

5. Spacemakers claims the trial court erred in granting summary judgment on its common law claims of negligence, conversion, and breach of statutory duties. We disagree.

Under OCGA § 11-3-420 (a) (i), the issuer of a check (in this case, Spacemakers) cannot maintain a claim for conversion against the bank under these circumstances as a matter of law. Further, regardless whether Spacemakers' common law claims can survive independently of the provisions of the Georgia Commercial Code, there is no evidence in the record of this case to support these claims. See Divisions 1 and 2, supra. Accordingly, summary judgment was appropriate and there was no error.

*Judgment affirmed. Andrews, P. J., and Miller, J., concur.*

DECIDED JANUARY 21, 2005.

*David M. Kupsky*, for appellants.

---

[9] Although the trial court's order states that Spacemakers failed to timely notify the bank of "any unauthorized transactions," the court was clearly referring to the lack of notice only as to the first forged check, since it immediately referred to the "sixty-four subsequently forged checks." It is undisputed that Spacemakers failed to notify the bank of the first forged check within 30 days of receiving the bank statement for January 2000.

*Hawkins & Parnell, William H. Major III, David H. Wilson*, for appellee.